Anne W. WALKER, Appellant

v.

Honorable Ed JONES, Congressman of the United States, et al.

No. 83–1425.

United States Court of Appeals, District of Columbia Circuit.

Argued Nov. 16, 1983.

Decided May 1, 1984.

John J. Gilece, Jr., Washington, D.C., with whom William Harry Garber, Washington, D.C., was on brief, for appellant.

Stanley M. Brand, Gen. Counsel to the Clerk, U.S. House of Representatives, Washington, D.C., with whom Steven R. Ross, Deputy Counsel to the Clerk, U.S. House of Representatives, and Michael L. Murray, Asst. Counsel to the Clerk, U.S. House of Representatives, Washington, D.C., were on brief, for appellees.

Before WILKEY and GINSBURG, Circuit Judges, and MacKINNON, Senior Circuit Judge.

Opinion for the Court filed by Circuit Judge GINSBURG.

Opinion concurring in part and dissenting in part filed by Senior Circuit Judge MacKINNON.

GINSBURG, Circuit Judge:

This case concerns the discharge of a woman who managed the House of Representatives' restaurants; it presents an unsettled issue relating to the Constitution's command that "for any Speech or Debate in either House, [Members of Congress] shall not be questioned in any other Place." U.S. CONST. art. I, § 6, cl. 1.

Plaintiff-appellant Anne W. Walker alleged in her complaint that, because she is a woman, and in violation of her fifth amendment rights to due process and the equal protection of the laws, she was discharged from her employment, of approximately ten years' duration, as general manager of the House of Representatives Restaurant System. She asserted that the discharge was effected by defendant-appellee Ed Jones, then Chairman of the Subcommittee on Services of the House of Representatives Committee on House Administration, acting in concert with defendant-appellee Thomas B. Marshall, then Staff Director of the Subcommittee. The District Court dismissed the complaint at the threshold in response to defendant-appellees' motion, which cited Rules 12(b)(1), (2), and (6) of the Federal Rules of Civil Procedure. Walker's discharge was a personnel action "within the 'legislative sphere,'" the District Court concluded; it therefore held that the Speech or Debate Clause wholly immunized the termination of her employment from judicial inquiry. *Walker v. Jones*, 557 F.Supp. 366, 368 (D.D.C.1983).

We reverse the judgment to the extent that it dismisses the case against Jones and Marshall,[1] and remand for further proceedings. The Speech or Debate Clause, we hold, does not impregnably shield from court consideration allegedly unconstitutional personnel actions taken in the course of managing congressional food service facilities.

## I. BACKGROUND

The District Court dismissed Walker's action with only her complaint and the Rule 12(b) motion before it. We must therefore assume the truth of Walker's allegations. As the Supreme Court has instructed lower federal courts: "[I]n passing on a motion

---

[1] Walker also named as defendants, in addition to the Subcommittee's Chairman and Staff Director, two other persons, then Representatives Mollahan and Coyne, who served as Subcommittee members at the time of the episode in suit; these Representatives allegedly delegated their authority to participate in the hiring and termination of employees to Jones and Marshall, and knew that Jones and Marshall intended to discharge Walker. The complaint attributes no actual participation in the termination of Walker's employment to Mollahan and Coyne. *See infra* pp. 931–932. We find the allegation concerning their delegation too peripheral and insubstantial to warrant retaining them as parties-defendant. Walker, if her claim has merit, can achieve full relief without drawing in persons uninvolved in carrying out her discharge. We uphold the District Court's judgment to the limited extent that it dismisses the action against Mollahan and Coyne, and to that extent only.

to dismiss, whether on the ground of lack of jurisdiction over the subject matter or for failure to state a cause of action, the allegations of the complaint should be construed favorably to the pleader." *Scheuer v. Rhodes,* 416 U.S. 232, 236, 94 S.Ct. 1683, 1686, 40 L.Ed.2d 90 (1974) (citing as applicable to a motion to dismiss grounded on asserted eleventh amendment and executive immunity barriers to suit the standard set out in *Conley v. Gibson,* 355 U.S. 41, 45–46, 78 S.Ct. 99, 101–102, 2 L.Ed.2d 80 (1957)).[2] We summarize first Walker's salient assertions along with related undisputed facts; we next indicate the bases on which defendant-appellees seek affirmance of the District Court's judgment; we then describe the main lines of the District Court's opinion.

The Subcommittee on Services of the House of Representatives Committee on House Administration (hereafter, Subcommittee) operates congressionally-owned food services; other auxiliary facilities within the Administration Committee's province include barber shops, beauty shops, and parking facilities. *See* Joint Appendix (J.A.) 70, 71. In December 1970, Walker alleges, the Subcommittee engaged her to manage Longworth Cafeteria and shortly thereafter appointed her general manager of the entire House of Representatives Restaurant System (hereafter, HRRS). HRRS emcompasses three cafeterias, four carryouts, two catering operations, and one full-service restaurant. Walker had authority to take actions necessary and proper for the efficient operation and sound management of HRRS. Her work, she asserts, entailed no functions relating to the process of lawmaking. Nor does restaurant management involve "other matters" of state "which the Constitution places within the jurisdiction of either House," *Gravel v. United States,* 408 U.S. 606, 625, 92 S.Ct. 2614, 2627, 33 L.Ed.2d

583 (1972), such as impeachments and advice and consent to treaties and appointments. Walker states that she expected to retain her position so long as her performance was satisfactory. She attributes this expectation primarily to communications she had with Subcommittee members when she was hired and throughout her employment.

During Walker's tenure as HRRS general manager, defendant-appellee Ed Jones became Chairman of the Subcommittee and defendant-appellee Thomas B. Marshall became its Staff Director. Pursuant to Subcommittee authorization, Jones and Marshall exercised managerial and control functions over HRRS employees, including Walker. In 1980, Walker alleges, Jones indicated approval of her work and informed her he was increasing her salary by $8,000 per annum because of her efficiency in operating HRRS. She further asserts that, until June 1982, Marshall permitted her to run HRRS without intervention. Walker alleges, however, that her situation at work changed around that time. She claims that Jones stated to others, and Marshall repeated to staff members, that because of Walker's sex, she was overpaid; specifically, Walker recites Jones's alleged statement that her salary ($45,000, according to Walker) was "ridiculous for a woman."

At a May 1982 meeting with Jones and Marshall, Walker allegedly detailed HRRS's operations and profit structure. Her accounting, she asserts, elicited no comment; the meeting concluded, she states, without any expression by Jones or Marshall of dissatisfaction with her performance. By letter dated June 22, 1982, however, Jones advised Walker that he was terminating her employment effective June 30, 1982;[3] and on June 25, 1982, Marshall

---

**2.** In near total disregard of this instruction, the dissenting opinion reads the complaint's allegations in the light least favorable to Walker, accepts as fact unsworn, undocumented contention presented by a pre-answer motion to dismiss, and apparently would bar Walker's recourse to the discovery process to obtain any

information or evidence relevant to her opponents' allegations.

**3.** Jones wrote (J.A. 64):

It is with regrets that I must terminate your employment as General Manager of the

circulated a memorandum to "All Managers and Department Heads" announcing that, effective June 26, "the office of General Manager of the House Restaurant System will be vacated." In July 1982, Jones and Marshall engaged a man to occupy the general manager's position formerly held by Walker.[4]

After Walker's discharge, Jones made public statements, which Walker alleges he knew to be untrue, charging Walker with inefficiency, improper bookkeeping practices, misappropriation, and "skimming" funds from HRRS. Walker asserts that, in addition to loss of her House employment and attendant benefits, the discharge and accusations relating to it caused her to suffer physical and emotional distress, permanently damaged her reputation, and left her unable to obtain employment comparable in nature and salary.

Jones and Marshall claim that the Speech or Debate Clause entirely shields the discharge of Walker from judicial inquiry. Appellees' presentation blends the bases

for this claim of blanket legislative immunity. We detect, however, two principal strains in appellees' argument, and an overarching position. Appellees contend in one prominent theme that Walker's high post as manager of a "multimillion dollar food service" organization made her a "ranking aide[ ]" or "alter-ego" of the Subcommittee. *See* Brief for Appellees at 11, 19–20. They also assert repeatedly that the discharge decision qualifies as a legislative act because it was reached and effected "in committee." *See id.* at 10, 15–16, 25.[5] Throughout, they observe that food service caters to a need essential to the chamber's internal functioning. Personnel management for such an essential service, they urge, merits Speech or Debate coverage as fully as passage of a bill. *See id.* at 10, 17, 20, 22.

In addition to Speech or Debate shelter, Jones and Walker assert that members of Congress have absolute or at least qualified official immunity with respect to legislative branch personnel decisions,[6] and that

House Restaurant System effective June 30, 1982.

    By copy of this letter to the Administrative Office, I am authorizing them to pay you for one month as separation pay plus any accrued annual leave you may not have used.

   . . . .

4. For lack of specificity, the dissenting opinion [at 943–944] would hold the complaint inadequate to state a claim against Marshall. But Walker plainly identifies Marshall, acting together with Jones, as a prime mover in her discharge. To survive dismissal under Rule 12(b), she was not required to plead further particulars. *See supra* text accompanying note 2.

5. In support of this assertion, a page, unaccompanied by any affidavit, is attached to the motion to dismiss, *see* J.A. 63, indicating that the Subcommittee met in executive session on May 26, 1982. The page provides no information on Walker's discharge. In addition to the heading "Executive Session," the date, Subcommittee name, and list of persons present, it states in its entirety: "The subcommittee met, pursuant to call at 9 a.m., in Room H–328, The Capitol, Hon. Ed Jones (chairman of the Subcommittee) presiding." Walker questions whether the discharge decision was even discussed at the May 26, 1982, meeting; she points out that the actions of Jones and Marshall, terminating her

employment, occurred almost a month later. *See* Brief for Appellant at 17; Reply Brief for Plaintiff-Appellant at 9.

6. Brief for Appellees at 25–37. Appellees further contend that "insofar as appellant sought to compel back pay and reinstatement, appellant sought, in reality, to compel the United States to remedy the alleged wrong, and therefore, the action was barred by sovereign immunity." *Id.* at 5. Appellant's compensatory and punitive damage claims seek no money from the United States Treasury; instead, in suing individual defendants, appellant is simply following the private right of action path first marked in *Bivens v. Six Unknown Named Agents of Federal Bureau of Narcotics*, 403 U.S. 388, 91 S.Ct. 1999, 29 L.Ed.2d 619 (1971). *See Davis v. Passman*, 442 U.S. 228, 99 S.Ct. 2264, 60 L.Ed.2d 846 (1979). We note also that, in 1976, Congress eliminated sovereign immunity as a defense in all equitable actions for specific, non-monetary relief against a United States agency or officer acting in an official capacity. *See* 5 U.S.C. § 702, *as amended by* Pub.L. No. 94–574, 90 Stat. 2721 (1976); S.Rep. No. 996, 94th Cong., 2d Sess. 7–8 (1976); H.R.Rep. No. 1656, 94th Cong., 2d Sess. 7–9 (1976), U.S.Code Cong. & Admin.News 1976, p. 6121. *See also Sea-Land Serv., Inc. v. Alaska R.R.*, 659 F.2d 243, 244 (D.C.Cir.1981), *cert. denied*, 455 U.S. 919, 102 S.Ct. 1274, 71 L.Ed.2d 459 (1982).

in any event Walker has stated no claim upon which relief can be granted. *Id.* at 38–44. The District Court did not address these alternatively alleged grounds for dismissal. Nor did it refer to appellees' "alter-ego" and "in committee" arguments. It simply reasoned that internal arrangements Congress makes for its own necessities are "within the 'legislative sphere'"; that food service qualifies as such an arrangement; and that discharging Walker, as an action relating to the internal administration of Congress, is brigaded by Speech or Debate protection in light of precedent instructing broad interpretation of the Clause "to effectuate its purposes." 557 F.Supp. at 367–68 (quoting *Eastland v. United States Servicemen's Fund,* 421 U.S. 491, 501, 95 S.Ct. 1813, 1820, 44 L.Ed.2d 324 (1975)).

It is the high purpose of the Speech or Debate Clause to secure against executive or judicial interference the processes of the nation's elected representatives leading up to the formulation of legislative policy and the enactment of laws. *See Hutchinson v. Proxmire,* 443 U.S. 111, 126–27, 99 S.Ct. 2675, 2683–84, 61 L.Ed.2d 411 (1979). For the reasons set out below, however, we believe that personnel actions regarding the management of congressional food services are too remote from the business of legislating to rank "within the legislative sphere."

## II. DECISION

In Title VII of the Civil Rights Act of 1964, as amended, 42 U.S.C. §§ 2000e to 2000e–17 (1976 & Supp. V 1981), Congress prohibited, inter alia, sex discrimination in private and public employment. Congress exempted its own staffs, however, from Title VII's coverage. *See id.* § 2000e–16(a). In *Davis v. Passman,* 442 U.S. 228, 99 S.Ct. 2264, 60 L.Ed.2d 846 (1979), the Supreme Court implied a remedy directly from the fifth amendment for sex discrimination by a member of Congress in dismissing a female staff member. The Court left open for consideration on remand the applicability of the Speech or Debate Clause to congressional employment practices. *See id.* at 235–36 n. 11, 249, 99 S.Ct. at 2271–72 n. 11, 2279. This case presents one setting in which that issue arises.

In the discussion that follows, we explain first our reasons for holding that the Speech or Debate Clause does not bar Walker's complaint against Jones and Marshall. We then indicate why we believe Walker's action survives the alternative threshold defenses appellees present—immunity outside the Speech or Debate Clause, and failure to state a claim upon which relief can be granted.[7]

A. *Constitutional review by courts of the discharge of a congressional employee who performed auxiliary, nonlegislative services for the convenience of members of Congress is not barred by the Speech or Debate Clause.*

1. *The province of the Speech or Debate Clause.*

▇▇ The Speech or Debate Clause derives from the English Bill of Rights of 1689; it concerns a privilege "recognized [since the Glorious Revolution in Britain, and throughout United States history] as

---

7. Because the District Court dismissed Walker's complaint on Speech or Debate Clause grounds, it did not reach these alternative defenses. Ordinarily, a federal appellate court will not consider issues left undecided by the trial court; here, however, the nature of the issues and the posture of the case justify our departure from that general rule. *See Singleton v. Wulff,* 428 U.S. 106, 120–21, 96 S.Ct. 2868, 2877, 49 L.Ed.2d 826 (1976). The defenses present questions of law fully briefed by the parties. Their adjudication now, informed by an adversarial airing, should occasion no surprise. Reference of these initial issues to the District Court, when that tribunal would not be better positioned than we are at this juncture to address the questions, "would be a waste of judicial resources." *Grace v. Burger,* 665 F.2d 1193, 1197 n. 9 (D.C.Cir.1981) (quoting *United States v. Aulet,* 618 F.2d 182, 186 (2d Cir.1980)), *aff'd in part and vacated in part on other grounds sub nom. United States v. Grace,* 461 U.S. 171, 103 S.Ct. 1702, 75 L.Ed.2d 736 (1983). *See also Railroad Yardmasters of America v. Harris,* 721 F.2d 1332, 1337 (D.C.Cir.1983).

an important protection of the independence and integrity of the legislature." *United States v. Johnson*, 383 U.S. 169, 177, 178, 86 S.Ct. 749, 753, 754, 15 L.Ed.2d 681 (1966). The purpose of the protection secured by the Clause "is not to forestall judicial review of legislative action," *Powell v. McCormack*, 395 U.S. 486, 505, 89 S.Ct. 1944, 1955, 23 L.Ed.2d 491 (1969), but to free legislators from distraction or hindrance as the process of lawmaking unfolds. "The heart of the clause is speech or debate in either House," *Gravel v. United States*, 408 U.S. 606, 625, 92 S.Ct. 2614, 2627, 33 L.Ed.2d 583 (1972), but the provision shields more than "words spoken in debate." *Kilbourn v. Thompson*, 103 U.S. 168, 204, 26 L.Ed. 377 (1880). It encompasses, beyond speeches on the floor of Congress, such activity integral to lawmaking as voting, *id.*, circulation of information to other Congress members, *Doe v. McMillan*, 412 U.S. 306, 93 S.Ct. 2018, 36 L.Ed.2d 912 (1973), and participation in committee investigations, proceedings, and reports. *Id.; Gravel v. United States, supra; Dombrowski v. Eastland*, 387 U.S. 82, 87 S.Ct. 1425, 18 L.Ed.2d 577 (1967); *Tenney v. Brandhove*, 341 U.S. 367, 71 S.Ct. 783, 95 L.Ed. 1019 (1951).[8]

■ The absolute immunity secured by the Clause, however, is "not all-encompassing." *Gravel v. United States*, 408 U.S. at 625, 92 S.Ct. at 2627. It would demean the high purpose of the Speech or Debate privilege to extend it to official activities of Congress members and their aides in "mundane fields" outside "the legislative core." *Davis v. Passman*, 544 F.2d 865, 880 (5th Cir.1977), *rev'd on other grounds*, 571 F.2d 793 (5th Cir.1978) (en banc), *rev'd*, 442 U.S. 228, 99 S.Ct. 2264, 60 L.Ed.2d 846 (1979). As Chief Justice Burger has stated, "[t]he immunities of the Speech or Debate Clause were not written into the Constitution simply for the personal or private benefit of Members of Congress, but to protect the integrity of the legislative process." *United States v.*

*Brewster*, 408 U.S. 501, 507, 92 S.Ct. 2531, 2535, 33 L.Ed.2d 507 (1972). Activities "casually or incidentally related to legislative affairs," *id.* at 528, 92 S.Ct. at 2545, but not "part and parcel of the legislative process," *Gravel v. United States*, 408 U.S. at 626, 92 S.Ct. at 2627, are outside the realm of Speech or Debate protection.

■ Thus, for example, a member's report and vote on holding a witness in contempt are immune, but not subsequent conduct to implement the expressed legislative will. *See Kilbourn v. Thompson, supra*. Newsletter and press releases circulated by a member to the public are not shielded, for they are "primarily means of informing those outside the legislative forum." *Hutchinson v. Proxmire*, 443 U.S. 111, 133, 99 S.Ct. 2675, 2687, 61 L.Ed.2d 411 (1979). A member of Congress may be prosecuted for accepting a bribe or for other unlawful conduct so long as the prosecution "does not draw in question the legislative acts of the defendant member of Congress or his motives for performing them." *United States v. Brewster*, 408 U.S. at 510, 92 S.Ct. at 2536 (quoting *United States v. Johnson*, 383 U.S. at 185, 86 S.Ct. at 758). *Accord United States v. Helstoski*, 442 U.S. 477, 99 S.Ct. 2432, 61 L.Ed.2d 12 (1979); *see also Gravel v. United States*, 408 U.S. at 618–22, 92 S.Ct. at 2623–25. The key consideration, Supreme Court decisions teach, is the act presented for examination, not the actor. Activities integral to the legislative process may not be examined, *see id.* at 625, 92 S.Ct. at 2627, but peripheral activities not closely connected to the business of legislating do not enjoy Speech or Debate shelter.

In addition to instruction furnished by High Court precedent, two decisions within this Circuit warrant comment because the District Court relied heavily upon them: *Consumers Union of United States v. Periodical Correspondents' Association*, 515 F.2d 1341 (D.C.Cir.1975), *cert. denied*, 423 U.S. 1051, 96 S.Ct. 780, 46 L.Ed.2d 640 (1976); and *Parker v. Allen*, Civil No. 74–

---

**8.** *See also Eastland v. United States Servicemen's Fund*, 421 U.S. 491, 95 S.Ct. 1813, 44 L.Ed.2d

324 (1975) (Clause covers issuance of subpoenas pursuant to committee investigation).

1846 (D.D.C. June 6, 1975), *reprinted in* J.A. 80–98.

*Consumers Union* held that arrangements for seating the press in the House and Senate galleries were "integral" to "the legislative machinery," 515 F.2d at 1350, and thus were immune from judicial review by virtue of the Speech or Debate Clause. In contrast to the hiring and firing of a food service manager, the matter at issue in *Consumers Union* immediately concerned House consideration of proposed legislation. Indeed, the arrangements in question were intended to shield members of Congress from press members' use of their House access to lobby legislators. *Id.* at 1347 & n. 12. *Consumers Union*, in short, involved, as Walker's discharge surely does not, regulation of the very atmosphere in which lawmaking deliberations occur.

*Parker v. Allen*, an unpublished District Court decision,[9] bears a considerable resemblance to this case. It involved the discharge of the Senate Restaurant's head waiter and his complaint that fifth amendment due process constraints on government action had been ignored. The District Court in *Parker* characterized restaurant administration as "within the 'legislative sphere,' " slip op. at 9, *reprinted in* J.A. 88, but it nonetheless granted the head waiter significant relief.

The *Parker* complaint was dismissed only insofar as it named as defendants members of the Senate Committee on Rules and Administration; nothing in the *Parker* record indicated that the Senators had done anything beyond considering and voting on the matter in subcommittee. *Cf. supra* note 1. The actual firing of the head waiter, however, was another matter. It was effected by the Architect of the Capitol. That action, the District Court held, as distinguished from the preceding consideration and vote in subcommittee, was "not within the privilege of the Speech or Debate Clause." Slip op. at 12, *reprinted in* J.A. 91. The District Court proceed-

ed to find that the conditions under which the firing occurred did infringe upon a liberty interest protected by the due process guarantee, and it ordered the Architect of the Capitol to accord appropriate relief to the former head waiter. Had the District Court in the case at hand in fact followed *Parker*, as it purported to do, it would have held, as *Parker* did, that the actual discharge "was not … essential to the act of legislating and hence [could] not be deemed within the legislative sphere." *Id.*

2. *Personnel actions in the course of superintending congressional food service facilities are outside the province of the Speech or Debate Clause.*

It has been argued persuasively that [w]hen members of Congress dismiss employees they are neither legislating nor formulating legislation. The fear of judicial inquiry into dismissal decisions cannot possibly affect a legislator's decision on matters pending before Congress. The democratic process remains unfettered.

*Davis v. Passman*, 544 F.2d 865, 880 (5th Cir.1977), *rev'd on other grounds*, 571 F.2d 793 (5th Cir.1978) (en banc), *rev'd*, 442 U.S. 228, 99 S.Ct. 2264, 60 L.Ed.2d 846 (1979). This case raises a narrower question. We reserve for another day and case the issue whether Speech or Debate protection attends the hiring and firing of congressional staff members who have "a meaningful input into … legislative decisionmaking." *Davis v. Passman*, 544 F.2d at 880–81 n. 25; *see Nixon v. Fitzgerald*, 457 U.S. 731, 767 n. 2, 102 S.Ct. 2690, 2711 n. 2, 73 L.Ed.2d 349 (1982) (White, J., joined by Brennan, Marshall, and Blackmun, JJ., dissenting) (dictum) ("a personnel decision allegedly made for unlawful reasons … does not fall within the … legislative … functions to which absolute immunity attaches").

Walker alleges that her job as general manager of food services entailed no func-

9. An unpublished opinion may not be cited to this court as precedent. *See* D.C.Cir.R. 8(f).

Because the District Court relied on *Parker*, however, discussion of it here is unavoidable.

tion relating to the process of making laws. Appellees insistently urge, however, that she was indeed a "ranking aide[ ]," and "alter-ego" of the Subcommittee. *See* Brief for Appellees at 11, 19–20. They compare her to the aide who helped Senator Gravel prepare for and conduct the Senate subcommittee hearing at which the Senator read from the Pentagon Papers, and placed them in the public record. *Id.* at 19–20; *see Gravel v. United States,* 408 U.S. 606, 609 & n. 3, 92 S.Ct. 2614, 2619 & n. 3, 33 L.Ed.2d 583 (1972). We find the comparison far-fetched.

■ Personnel who attend to food service, medical care, physical fitness needs, parking, and haircutting for members of Congress no doubt contribute importantly to our legislators' well-being and promote their comfort and convenience in carrying out Article I business. But these staff members, unlike those who help prepare for hearings or assist in the composition of legislative measures, cater to human needs that are not "intimately cognate," *Davis v. Passman,* 544 F.2d at 879, to the legislative process. The "fundamental purpose" of the Speech or Debate Clause is to "free[ ] the legislator from executive and judicial oversight that realistically threatens to control his conduct *as a legislator.*" *Gravel v. United States,* 408 U.S. at 618, 92 S.Ct. at 2623 (emphasis added). Auxiliary services attending to human needs or interests not peculiar to a Congress member's work qua legislator may advance a member's general welfare. To characterize personnel actions relating to such services as "legislative" in character, however, is to stretch the meaning of the word beyond sensible proportion. Selecting, supervising, and discharging a food facilities manager, we believe, is not reasonably described as work that significantly informs or influences the shaping of our nation's laws.

■ Nor do we grasp why consideration or a vote "in committee" should place all personnel superintendence of auxiliary services of a nonlegislative character inside a "legislative sphere." Assuming arguendo that anything done "in committee" is necessarily a "legislative act[ ]," *see* Brief for Appellees at 10, Walker's complaint against Jones and Marshall nonetheless survives a Rule 12(b) motion.

We note initially that Walker's complaint, far from alleging that her discharge was effected "in committee," states: "During June 1982, Defendants Jones and Marshall discharged plaintiff from employment ...." Complaint ¶ 16, *reprinted in* J.A. 12. She does not center her case on any vote, resolution, hearing, report, or proceeding in the House or a committee or subcommittee thereof. Instead, she dominantly charges illegal conduct beyond the protection of the Speech or Debate Clause—the carrying out or execution of a constitutionally flawed decision.[10]

In two respects, we believe, appellees misread the High Court precedent they cite. First, they do not separate whatever may have occurred "in committee" from ensuing activity to execute a committee vote. Second, they appear to assume that only aides, not members of Congress themselves, are answerable for carrying out an unlawful or unconstitutional directive. *See* Brief for Appellees at 16.

The Supreme Court has drawn a key distinction, not squarely faced by appellees, between "legislative speech or debate and associated matters such as voting and committee reports and proceedings," on the one hand, and "executing a legislative order," or "carrying out [legislative] directions," on the other hand. *Gravel v. United States,* 408 U.S. at 620–21, 92 S.Ct. at 2624–25; *see also Doe v. McMillan,* 412 U.S. 306, 314–15, 93 S.Ct. 2018, 2025–26, 36 L.Ed.2d 912 (1973). The former, the Supreme Court has emphasized, is what the

---

**10.** Assiduously reading a plaintiff's opening pleading, on a threshold motion to dismiss, in the light most favorable to the defendants, *see supra* note 2 and accompanying text, the dis-

senting opinion [at 941–942] picks out a piece of the complaint to avoid fair description of the full pleading.

Speech or Debate Clause shields. But its precedent, the Court has cautioned, "reflect[s] a decidedly jaundiced view toward extending the Clause" to shield the latter. *Gravel v. United States*, 408 U.S. at 620, 92 S.Ct. at 2624.

Further, the Supreme Court has indicated that the Speech or Debate Clause immunity of the Congress member is no different from that of the member's ranking aides. *Id.* at 616–22, 92 S.Ct. at 2622–25. Specifically, the Court has observed that lines drawn in its opinions do not "involve[ ] distinguishing between a [member of Congress] and his personal aides with respect to legislative immunity." *Id.* at 621, 92 S.Ct. at 2625. "[B]oth aide and Member should be immune with respect to committee and House action leading to [an] illegal resolution." *Id.* But no case "[holds] that Members of Congress would be immune if they [personally] executed an invalid resolution." *Id.* "Neither [members of Congress] nor their aides should be immune from liability or questioning in such circumstances." *Id.*[11] Walker complains of Jones's execution, in concert with Marshall, of what appellees term a legislative order. As we read the High Court's instruction, neither Jones's status as a Congressman nor characterization of the underlying decision as "legislative" affords Jones or his aide, Marshall, absolute immunity from liability for carrying out that decision.[12]

In sum, appellees' "in committee" argument cannot carry the weight appellees would place upon it. The argument fails to advert to the Supreme Court's instruction that execution of a decision, even if the decision itself is properly called "legislative," is not cloaked with Speech or Debate immunity, for execution or carrying out directions post-dates what the Clause protects—the *process* leading up to the issuance of legislative directions.

B. *Official immunity does not support the threshold dismissal of Walker's action.*

*Nixon v. Fitzgerald*, 457 U.S. 731, 102 S.Ct. 2690, 73 L.Ed.2d 349 (1982), held the President absolutely immune from suit based on his personnel decisions. Appellees invite us to declare the same rule applicable to members of Congress. Lower courts are not positioned to entertain such argument; the Supreme Court has instructed that absolute immunity for members of Congress does not extend beyond the scope of the Speech or Debate Clause. *See Harlow v. Fitzgerald*, 457 U.S. 800, 810–11, 102 S.Ct. 2727, 2734–35, 73 L.Ed.2d 396 (1982); *Davis v. Passman*, 442 U.S. 228, 235 n. 11, 246, 99 S.Ct. 2264, 2272 n. 11, 2277, 60 L.Ed.2d 846 (1979).

Members of Congress may assert the same qualified immunity available to executive officials; officials can prevail on this ground if they establish that "their conduct [did] not violate clearly established statutory or constitutional rights of which a reasonable person would have known." *Harlow v. Fitzgerald*, 457 U.S. at 818, 102 S.Ct. at 2738; *see also id.* at 807, 102 S.Ct. at 2732. Appellees center their argument for qualified immunity on the less than crystalline state of the law regarding the Speech or Debate Clause. Their argument is misguided. Under the heading of qualified immunity, they should not have addressed the question whether they are subject to suit at all, however clear the charge that their conduct violated an alleged right.

---

**11.** We recognize that the Supreme Court has not to date had occasion to hold a member of Congress unprotected by the Speech or Debate Clause on the ground that the challenged action executed an illegal, but sheltered, legislative decision. The Court has several times held legislative aides unprotected on that ground. *See Doe v. McMillan*, 412 U.S. 306, 93 S.Ct. 2018, 36 L.Ed.2d 912 (1973) (public distribution of materials allegedly invading plaintiffs' privacy); *Powell v. McCormack*, 395 U.S. 486, 89 S.Ct.

1944, 23 L.Ed.2d 491 (1969) (refusal to admit, pay, and perform services for Congressman illegally excluded by the House); *Kilbourn v. Thompson*, 103 U.S. 168, 26 L.Ed. 377 (1880) (imprisonment of plaintiff for defiance of illegal congressional subpoena).

**12.** As to the qualified immunity defense proffered for Jones and Marshall, see *infra* pp. 941–942.

Instead, the relevant inquiry is whether the conduct complained of—for example, the alleged sex discriminatory discharge,[13] or the alleged liberty-depriving job termination accompanied by reputation-damaging public utterances [14]—violated a clearly established constitutional right. The blank record and misdirected argument now before us, in short, supply no justification for dismissing this action on a qualified immunity ground.[15]

C. *Walker's complaint is not susceptible to dismissal for failure to state any claim upon which relief can be granted.*

Appellees ultimately argue that Walker has stated no claim upon which relief can be granted. High Court precedent precludes the District Court from tying instant dismissal of Walker's action to that defensive plea.

■ Walker's complaint alleges she was dismissed from her post as HRRS general manager because of her sex. In *Davis v. Passman*, 442 U.S. 228, 99 S.Ct. 2264, 60 L.Ed.2d 846 (1979), the Supreme Court held that a claim for damages based on a sex discriminatory congressional employment decision can be presented directly under the fifth amendment. Walker has stated just such a claim.

■ Moreover, Walker asserts that Jones, in accounting for Walker's discharge, publicly uttered reputation-damaging statements about her, knowing those statements to be false. In particular, Jones allegedly said Walker had misappropriated and "skimm[ed]" funds from HRRS. In *Paul v. Davis*, 424 U.S. 693, 96 S.Ct. 1155, 47 L.Ed.2d 405 (1976), the Supreme Court held that defamation by a public official, without more, does not intrude on a liberty or property interest protected by the due process guarantee. But *Paul* suggested that when discharge from government employment accompanies an utterance stigmatizing a person's - good name, a due process claim may well lie. *See* 424 U.S. at 710, 96 S.Ct. at 1165 (*Board of Regents v. Roth*, 408 U.S. 564, 92 S.Ct. 2701, 33 L.Ed.2d 548 (1972), "recognized that governmental action defaming an individual in the course of declining to rehire him could entitle the person to notice and an opportunity to be heard as to the defamation.").[16] Walker's complaint is lean with respect to the facts of her employment-plus-reputation claim, but she has said enough to enter the court's door and receive a focused answer. *See Conley v. Gibson*, 355 U.S. 41, 45–46, 78 S.Ct. 99, 101–102, 2 L.Ed.2d 80 (1957).

CONCLUSION

We have limited this examination to the question whether Walker's complaint tenders any claim which, if proved, could entitle her to relief. The answer to that

---

13. *See Mississippi Univ. for Women v. Hogan*, 458 U.S. 718, 102 S.Ct. 3331, 73 L.Ed.2d 1090 (1982); *Davis v. Passman*, 442 U.S. 228, 99 S.Ct. 2264, 60 L.Ed.2d 846 (1979); *Frontiero v. Richardson*, 411 U.S. 677, 93 S.Ct. 1764, 36 L.Ed.2d 583 (1973).

14. *See Paul v. Davis*, 424 U.S. 693, 709–10, 96 S.Ct. 1155, 1164–65, 47 L.Ed.2d 405 (1976); *Board of Regents v. Roth*, 408 U.S. 564, 573, 92 S.Ct. 2701, 2707, 33 L.Ed.2d 548 (1972).

15. In any case, qualified immunity presents no bar to Walker's claim for injunctive relief. *See Wood v. Strickland*, 420 U.S. 308, 314–15 n. 6, 95 S.Ct. 992, 996–97 n. 6, 43 L.Ed.2d 214 (1975); *Gannon v. Daley*, 561 F.Supp. 1377, 1387 n. 27 (N.D.Ill.1983) (collecting cases); *see also NTEU v. Nixon*, 492 F.2d 587, 609 (D.C.Cir.1974); *supra* note 6.

16. The force of the cited precedent is essentially conceded by appellees. *See* Brief for Appellees at 42. Appellees contend, however, that Walker had a "hearing [before the Subcommittee] sufficient to meet the notice and hearing requirements of due process." *Id.* at 43. Walker's complaint, in contrast to appellees' misreading of it, refers only to a meeting with Jones and Marshall in May 1982, not to any meeting with the Subcommittee. Indeed, Walker flatly denies ever receiving a hearing before the Subcommittee, Jones, Marshall, or anyone else on the adequacy of her performance or her discharge. Reply Brief for Plaintiff-Appellant at 9; *see also supra* note 5. The issue thus entails a dispute as to the facts; it plainly is not susceptible to resolution on a threshold motion to dismiss the complaint.

question is "yes." We hold simply and only that personnel actions of the kind Jones and Marshall are alleged to have taken, if effected for unlawful reasons, do not fall within the legislative functions to which the absolute immunity of the Speech or Debate Clause attaches.[17]

For the reasons stated, the judgment of the District Court is reversed to the extent that it dismisses Walker's complaint against Jones and Marshall, and the case is remanded for further proceedings consistent with this opinion.

*It is so ordered.*

MacKINNON, Senior Circuit Judge (dissenting in part and concurring in part):

This case presents important separation-of-powers questions concerning judicial review of Congress' hiring and firing of its own employees. While I concur in part with the majority's decision that this case should be remanded to the district court for litigation of certain factual allegations, I cannot join in much of the opinion. I believe that the majority's constitutional analysis is flawed.

In my opinion, the trial court's dismissal of the complaint against three of the four defendants—Representatives Mollohan and Coyne, and Subcommittee staff director Marshall—should be upheld on the grounds of Speech or Debate immunity. As to the immunity of Representative Jones only, I would remand to the district court for a further narrow inquiry made necessary by recent Supreme Court opinions distinguishing between legislative decisions and subsequent ministerial acts. I write separately both to emphasize factual aspects of this case not adverted to in the majority opinion, and to outline the Speech or Debate analysis that in my view ought properly to be applied to this case.

1. THE PROCEDURAL SETTING OF THIS CASE

Presented for review by this Court is the district court's dismissal of plaintiff's case against *four* defendants—three Members of Congress and one House subcommittee staff director. The three Members named served on the House Administration Committee and constituted a majority of the House Subcommittee on Services. *See* Complaint ¶ 17 (JA 12–13). The district court held all aspects of the alleged conduct of the four defendants immune under the Speech or Debate Clause. Although other issues are presented, the chief questions before this Court concern Speech or Debate.

The most important factual allegations at this stage of the case are those relating to the defendants' asserted immunity under the Speech or Debate Clause.[1] The allegations in the complaint and plaintiff's opposition to the motion to dismiss are extremely vague. That vagueness made the task of the district court a difficult one. In my opinion, the majority fails to conduct the sort of incisive inquiry into the pleadings that is imperative in this case. The majority treats plaintiff's factual allegations as true for the purposes of this appeal, citing cases requiring the liberal reading of a complaint in the face of a Rule 12(b)(6) motion to dismiss for failure to state a claim. In addition to the complaint, however, the district court had before it the defendants' motion to dismiss—which differed significantly from the complaint as to the facts of the case—and the plaintiff's opposition thereto. Furthermore, it is important to recognize that the defendants' motion was filed under Rule 12(b)(1) as well as under 12(b)(6). Threshold disputes over *jurisdictional* matters differ substantially from disputes over whether a complaint adequately states a cause of action. In particular, when the movant denies or con-

---

17. Our holding rests on the sole pleading thus far presented—Walker's complaint. We foreclose no ruling further development of the facts may warrant.

1. I concur with the majority that plaintiff's allegations might, if proved, make out a valid cause

of action against a proper defendant for unconstitutional gender discrimination. *See Davis v. Passman,* 442 U.S. 228, 246, 248, 99 S.Ct. 2264, 2277, 2278, 60 L.Ed.2d 846 (1979). The case would be justiciable. *See id.* at 235 n. 11, 99 S.Ct. at 2272 n. 11.

troverts the plaintiff's factual allegations going to subject matter jurisdiction, the burden is on the opposing party to assert jurisdiction, and the recitals in the complaint are no longer controlling. *See KVOS, Inc. v. Associated Press*, 299 U.S. 269, 278, 57 S.Ct. 197, 201, 81 L.Ed. 183 (1936); 5 C. Wright & A. Miller, Federal Practice & Procedure § 1350 at 555, § 1363 at 653–54 (1969).

In my opinion, the issues of Speech or Debate immunity here presented are jurisdictional in nature, fall under Rule 12(b)(1) rather than 12(b)(6) for purposes of the motion to dismiss, and should be treated accordingly upon the pleadings in this case. Close scrutiny of the facts relating to defendants' legislative immunity is appropriate. The proper categorization of Speech or Debate immunity as a jurisdictional matter is based upon the constitutional text of the Clause, upon its history and purpose, and upon Supreme Court precedent. Although the Clause is found in Article I rather than Article III of the Constitution, the text is cast in jurisdictional terms:

> The Senators and Representatives ... for any Speech or Debate in either House, ... *shall not be questioned in any other Place.*

U.S. Const. art. I, § 6, cl. 1 (emphasis added). This language must be read as an independent limitation on the federal judicial power, in addition to those limitations imposed by Article III itself. The historical background of the Clause confirms this conclusion: the establishment of Speech or Debate immunity in England represented "the culmination of a long struggle for parliamentary supremacy"—a struggle by Parliament to fend off the efforts of the Tudors and Stuarts to enlist the courts in their harassment and disciplining of legislators. *United States v. Johnson*, 383 U.S. 169, 178, 86 S.Ct. 749, 754, 15 L.Ed.2d 681 (1966); *see id.* at 177–83, 86 S.Ct. at 753–57. The provision in the English Bill of Rights that was the direct ancestor of the Clause was framed as follows:

> That the Freedom of Speech, and Debates or Proceedings in Parliament, *ought not to be impeached or questioned in any Court* or Place out of Parliament.

1 W. & M. Sess. 2, c. 2 (1689) (emphasis added). In its transplanted form, Speech or Debate immunity was constitutionalized as a limitation on the powers of the Executive and Judicial branches to intrude into the legislative sphere. *See, e.g., United States v. Helstoski*, 442 U.S. 477, 491, 99 S.Ct. 2432, 2440, 61 L.Ed.2d 12 (1979) (citations omitted).[2] As judicial review has evolved, the Clause has come to be seen primarily as a limitation on the *authority of courts* to question legislative conduct. That recognizes it as a jurisdictional matter.

Although the Supreme Court has never explicitly addressed the place of Speech or Debate immunity within the procedural scheme of Rule 12(b), there is ample authority for treating legislative immunity as a jurisdictional matter in this context. Threshold resolution of Speech or Debate issues has been deemed critical. The Court has held that the Clause is designed to relieve legislators not only from adverse judgments upon protected activities, but also from the annoyance and burden of defending suits. *See Powell v. McCormack*, 395 U.S. 486, 505, 89 S.Ct. 1944, 1955, 23 L.Ed.2d 491 (1969); *Dombrowski v. Eastland*, 387 U.S. 82, 85, 87 S.Ct. 1425,

---

2. In 1797, during a federal grand jury investigation into the activities of several anti-Federalist Members of Congress, Thomas Jefferson wrote an essay on the constitutional legislative privilege. One representative statement that illuminates the jurisdictional nature of the Speech or Debate Clause is the following:

> [I]n order to give to the will of the people the influence it ought to have, and the information which may enable them to exercise it usefully, it was a part of the common law,

adopted as the law of this land, *that their representatives, in the discharge of their functions, should be free from the cognizance or coercion of the ... Judiciary ....*

8 Works of Thomas Jefferson 322–23 (Ford ed. 1904). James Madison supported Jefferson's essay. *See generally* Reinstein & Silverglate, "Legislative Privilege and the Separation of Powers," 86 Harv.L.Rev. 1113, 1140–42 (1973) (early history of Clause).

1427, 18 L.Ed.2d 577 (1967). Any suit that attempts to skirt the barrier of legislative immunity by resort to vague and conclusory pleadings is just such an annoyance and burden. The Court has explicitly mandated that Speech or Debate defenses "should . . . be given priority . . ." in litigation. *Davis v. Passman*, 442 U.S. 228, 236 n. 11, 99 S.Ct. 2264, 2272 n. 11, 60 L.Ed.2d 846 (1979).[3] Courts have a constitutional obligation to reach legislative immunity issues as early as possible, consistent with sound judicial practice, and to excuse legislative defendants expeditiously when the case so warrants. Furthermore, the Court has held that like a pure matter of subject matter jurisdiction, Speech or Debate immunity cannot be waived by the failure of a defendant to assert it at the threshold. *See United States v. Helstoski, supra*, 442 U.S. at 492, 99 S.Ct. at 2441. In my mind, the sum of the Supreme Court's pronouncements on the procedural treatment of Speech or Debate issues strongly supports resolving such issues under Rule 12(b)(1), which covers subject matter jurisdiction, rather than under 12(b)(6).

On this basis, while the district court may have been overly precipitous in excusing all four defendants from this case at this early stage, the majority here errs in the opposite direction. At the stage in this case when the district court passed on the motion to dismiss, the burden was on the plaintiff to show that the conduct of defendants placed in question by the complaint was *not* immune from the court's scrutiny. In their motion to dismiss, defendants generally asserted their Speech or Debate immunity, stating that plaintiff's discharge "constitutes an internal policy

decision which was effectuated 'in committee.' " *Defendants' Motion to Dismiss* at 9 (JA 35). Beyond that, however, defendants made factual assertions concerning their immunity that went well beyond the complaint, and that took issue with the complaint's allegations. In particular, defendants alleged a May 26, 1982, meeting of the *full Subcommittee*, convened at the request of plaintiff, in which consideration was given to plaintiff's job performance, and at which a vote was taken delegating the Subcommittee's authority to hire and fire to the Chairman. *See* Defendants' Motion to Dismiss at 3–4 (JA 29–30). As to the execution of the discharge, defendants asserted that the "decision implemented here did not involve legislative agents or functionaries; it was ordered *and* implemented by Members alone." *Id.* at 19 (JA 45).[1] Thus the motion to dismiss was more than a challenge to the sufficiency of plaintiff's allegations; it went to the factual predicates of the district court's jurisdiction over the case.[5] The burden was then upon plaintiff to support the jurisdiction that she claimed.

In response to the motion, plaintiff did nothing more than to recite the factual allegations of the complaint—allegations that were no longer controlling. Plaintiff introduced no affidavit in support of her original allegations. In contrast to the original complaint, however, the recital of facts *did not* allege that staff director Marshall had actually participated in the execution of the decision to discharge. *See* Plaintiff's Opposition to Motion to Dismiss at 3 (JA 106). Plaintiff argued, instead, that Marshall should be held legally responsible as Representative Jones' "alter

---

**3.** In a closely analogous context, the Supreme Court has expressed a strong preference for threshold resolution of official immunity questions. *See Harlow v. Fitzgerald,* 457 U.S. 800, 808, 818–19, 102 S.Ct. 2727, 2733, 2738–39, 73 L.Ed.2d 396 (1982). *See generally Gregoire v. Biddle,* 177 F.2d 579, 581 (2nd Cir.1949) (L. Hand, J.).

**4.** Defendants also denied that Marshall had any authority to discharge plaintiff. Defendants' Motion to Dismiss at 19 (JA 45). Plaintiff had alleged that the Subcommittee majority had del-

egated such authority to Representative Jones and Mr. Marshall. Complaint ¶ 17 (JA 13).

**5.** Plaintiff was apparently aware that defendants' motion went beyond the sufficiency of the allegations in the complaint. At oral argument upon the motion to dismiss, counsel for plaintiff stated "I think the defendants have gone beyond the allegations of the complaint in this particular instance for the purposes of this motion." *Walker v. Hon. Ed Jones,* Civ. A. No. 82–02723, Transcript of Proceedings of Feb. 9, 1983, at 15 (JA 139).

ego for purposes of liability." *Id.* at 15 (JA 118). This was the posture of the case when the district court made its ruling. The majority opinion fails to account fully for this situation. Upon this record, the trial court did not err in dismissing the complaint as to Representatives Coyne and Mollahan and Subcommittee staff director Marshall.

In addition, beyond refusing to uphold the district court's dismissal of three defendants from this suit, the majority in its generalizations fails to provide the district court with specific guidance as to how to dispose of the case correctly. The majority decision contains broad language that would appear to foreclose defendants from any further assertion of their Speech or Debate immunity, even if certain relevant factual allegations cannot be supported by evidence. *But see* Majority Decision at 934 n. 17. Under a proper construction of the Speech or Debate Clause, however, defendants Jones and Marshall can be held non-immune, if at all, only upon further development of the facts. In particular, one question of critical importance is whether Representative Jones himself took steps to "execute" the Subcommittee's decision to fire appellant. Collateral to this issue is whether Walker was not effectively fired when the Subcommittee acted and Jones' subsequent actions had no substantive effect. The remainder of this opinion will demonstrate the various ways in which the majority's Speech or Debate analysis is flawed, and will suggest how the Clause should be applied to the alleged facts of this case.

### 2. THE PROPER SCOPE OF SPEECH OR DEBATE IMMUNITY

The manner in which the majority addresses the question of defendants' Speech or Debate immunity departs radically from settled tradition and precedent and undercuts the constitutional purposes of legislative immunity. The majority fails adequately to recognize that the scope of Speech or Debate immunity must be determined in accordance with the constitutional functions of Congress, which are varied and far-ranging. Furthermore, the Speech or Debate Clause must be construed in harmony with the broader constitutional scheme of separated powers, and with its specific textual components.[6] Such an analysis is made all the more indispensable by the Supreme Court's pronouncement that *only* the Speech or Debate Clause can shield congressional employment decisions from judicial review, and that separation-of-powers concerns must be resolved in the context of legislative immunity. *See Davis v. Passman*, 442 U.S. 228, 235–36 n. 11, 99 S.Ct. 2264, 2271–72 n. 11, 60 L.Ed.2d 846 (1979).[7]

### A. Legislative Supervision of the House Restaurant and the Legislative Sphere

After an abstract and detached discussion of the scope of Speech or Debate immunity, the majority launches an argument that legislative supervision of the House Restaurant System inherently lies *outside* the legislative sphere. *See* Majority Opinion at 930–931. The majority flatly states that "[p]ersonnel actions in the course of superintending congressional food service facilities are outside the province of the Speech or Debate Clause." Majority Opinion at 930. The opinion argues that food services to the House are not vital to the democratic process, and concludes that "[t]o characterize personnel actions relating to [restaurant] services as 'legislative' in character ... is to stretch the meaning of the word beyond sensible proportion." *Id.* at 931. This entire ap-

---

**6.** "In the American governmental structure the [Speech or Debate] clause ... reinforc[es] the separation of powers so deliberately established by the Founders." *United States v. Johnson*, 383 U.S. 169, 178, 86 S.Ct. 749, 754, 15 L.Ed.2d 681 (1966) (citing The Federalist No. 48 (J. Madison) (Cooke, ed.)).

**7.** In light of the Supreme Court's ruling that Speech or Debate immunity constitutes the *sole* separation-of-powers barrier to adjudication of such cases, the majority's indication that qualified official immunity might shield defendants from liability in this case is puzzling. *See* Majority Opinion at 932–933.

proach is badly misguided, and constitutes a dangerous attack upon the integrity of the Legislative branch. The question here is not whether House supervision of its Restaurant conforms to some Platonic ideal of the "legislative" process, but rather whether the House has in practical fact treated the subject as a legislative matter in the constitutional sense. The majority professes not to understand what difference it makes whether plaintiff's discharge was effectuated in committee, *id.* at 931, but that question is the very nub of this case. If supervision of the Restaurant, including review of plaintiff's performance as General Manager of the system, was conducted entirely within the jurisdiction of the Subcommittee, then the majority's suggestions that the subject is "mundane," *id.* at 929, or not an important matter "of state," *id.* at 926, are wholly gratuitous.

The majority appears to believe that certain of Congress' internal administrative operations can be distinguished in a principled way from other legislative activities. In essence, this approach creates categories—"administrative" versus "legislative"—to distinguish among various subjects over which Congress chooses to exercise its powers. These categories find no basis whatsoever in Speech or Debate precedent. Not one Supreme Court decision even hints at such a constitutional distinction between various fields of congressional activity. The Supreme Court has distinguished between the "legislative" and "political" acts of Members of Congress for purposes of Speech or Debate immunity: the latter, unprotected category encompasses such activities *outside* Congress as constituent services (*e.g.,* lobbying for government appointments, assistance in obtaining government contracts) and speechmaking. *See United States v. Brewster,* 408 U.S. 501, 512, 92 S.Ct. 2531, 2537, 33 L.Ed.2d 507 (1972). In addition, the Court has held

outside Speech or Debate immunity such actions as the taking of a bribe, *see id.* at 526, 92 S.Ct. at 2544; the private republication of government documents, *see Gravel v. United States,* 408 U.S. 606, 627, 92 S.Ct. 2614, 2628, 33 L.Ed.2d 583 (1972); and false imprisonment. *See Kilbourn v. Thompson,* 103 U.S. 168, 26 L.Ed. 377 (1881). These acts are all tangential to the performance of legislative duties. The focus of Supreme Court cases, however, has always been on the relation of the individual's *act* in question in relation to the *legislative process*—not on the subject matter involved. Therefore these precedents provide the majority with no support whatsoever.[8]

The majority's sharp departure from existing law reflects an even deeper problem in its approach. Except in the most egregious of cases, this Court has no authority whatsoever to pass judgment on whether activities that the Congress treats as legislative conform to some artificial ideal of the legislative process. The majority in this case states that the entire *subject matter* of the Subcommittee's activity—the oversight of restaurant services—lies outside the legitimate sphere of legislative activity. This judgment fails to accord to the House the respect that any court owes a coordinate branch of government. Both the legislative facts of this case and the established construction of the Speech or Debate Clause will bear out this criticism.

At the very core of our constitutional separation of powers, we find the following provision:

> Each House may determine the Rules of its Proceedings, punish its Members for disorderly Behaviour, and, with the Concurrence of two thirds, expel a Member.

U.S. Const. art. I, § 5, cl. 2. This substantial authority of the House of Representa-

---

**8.** Those cases upon which the majority does rely are extremely weak precedent. Primary reliance is placed upon the original panel decision in *Davis v. Passman,* 544 F.2d 865, 880 (5th Cir.1977), which was *reversed* en banc on other grounds, 571 F.2d 793 (5th Cir.1978), and in which case the Speech or Debate issue was ultimately mooted by a settlement by the parties after the Supreme Court decision. The majority also relies substantially on *remote dicta* in a *dissenting* Supreme Court opinion, *Nixon v. Fitzgerald,* 457 U.S. 731, 767 n. 2, 102 S.Ct. 2690, 2711 n. 2, 73 L.Ed.2d 349 (1982) (White, J., dissenting).

tives (and the Senate) confers the power to establish rules for internal governance and must be broadly construed: subject only to clear constitutional limitations, that power is "absolute and beyond the challenge of any other body or tribunal." *United States v. Ballin*, 144 U.S. 1, 5, 12 S.Ct. 507, 509, 36 L.Ed. 321 (1892). What this means is that the House has virtually unquestionable authority to decide what activities constitute internal legislative matters, and to regulate, manage, or oversee those matters as it sees fit—whether through rules, committees, or by any other method.

Pursuant to this constitutional authority, the House Rules confer upon the Committee on House Administration jurisdiction over internal support services, "including the House Restaurant." [9] The House Administration Committee also exercises jurisdiction over all "employment of persons by the House ...." [10] In turn, Committee rules vest jurisdiction over "restaurant facilities" in the Subcommittee on Services—the Subcommittee involved in this case. [11] The lawfulness of these rules is not in question. The rules alone indicate that the House itself considers oversight of the House Restaurant to be an important legis-lative matter. House debates reveal that the Restaurant has long been deemed "absolutely essential for the conduct of the business of the House and for the accommodation of those who have business with the House ...." 6 Cannon's *Precedents of the House of Representatives* § 216 at 387 (1936). Over the past century, the House has made the Restaurant the subject of investigations, reports, and resolutions. In addition, the House has long jealously regarded its control over the Restaurant. *See, e.g.*, 5 A. Hinds' *Precedents of the House of Representatives* § 7244 at 1089–91 (1907). [12] Furthermore, management of the House Restaurant has been the subject of legislation. For instance, at one time the House enacted a law placing the Restaurant under the management and direction of the Architect of the Capitol. 40 U.S.C. § 174k(a) (1976). [13] In addition, the House by statute established a revolving fund to finance the Restaurant. 40 U.S.C. § 174k(b) (1976). The House (and the Senate) will be surprised to learn that, in the opinion of this Court, none of these substantial activities are within its legislative sphere.

**9.** H.R. Rule X, cl. 1(k)(12), Rules of the House of Representatives, *reprinted in* Constitution, Jefferson's Manual, and Rules of the House of Representatives, H.R.Doc. No. 271, 97th Cong., 2d Sess. § 680a, at 354–55 (hereinafter "House Rules") (1983). Committee jurisdiction was originally conferred by H.R.Res. 988, 93rd Cong., 2d Sess., 120 Cong.Rec. 34470 (1974).

The House Restaurant was previously under the jurisdiction of the Select Committee of the House Restaurant, *see* H.R.Res. 111, 93rd Cong., 1st Sess., 119 Cong.Rec. 3680 (1973), and before that, the Committee on the House Restaurant. *See* H.R.Res. 472, 91st Cong., 1st Sess., 115 Cong.Rec. 19080 (1969).

Also included within the Committee's jurisdiction under Rule X, cl. 1(k)(12) are other "services to the House, including ... parking facilities and administration of the House Office Buildings and of the House wing of the Capitol."

**10.** H.R. Rule X, cl. 1(k)(3), House Rules § 680a, at 354.

**11.** Rule 16(a), Rules of Procedure of the Committee on House Administration (adopted January 29, 1981), *reprinted in* Rules Adopted by the Committees of the House of Representatives, 97th Cong., 1st Sess. 133 (1981).

**12.** Debates discussing *Page v. District of Columbia*, 20 App.D.C. 469, 474–75 (D.C.Cir.1902), invalidating the convictions of the Senate and House restaurant managers for violations of the local liquor excise law, on the grounds that the law did not apply to the legislative restaurants, because those facilities were under the exclusive control of the respective Houses and their committees.

**13.** Pub.L. 76–812, ch. 780, § 208(a), 54 Stat. 1056 (Oct. 9, 1940), "authorized and directed" the Architect "to carry into effect" for the House the following resolution:

[T]he *management of the House restaurant and all matters connected therewith shall be under the direction of the Architect* of the United States Capitol under such rules and regulations as he may prescribe for the operation and the employment of necessary assistance for the conduct of said restaurant by such business methods as may produce the best results consistent with economical and modern management.

H.R.Res. 590, 76th Cong., 3rd Sess., 86 Cong. Rec. 11532 (1940) (emphasis added).

940

The majority simplistically views legislative activity as that which directly "relat[es] to the process of making laws," Majority Opinion at 931, or "work that significantly informs or influences the shaping of our nation's laws." *Id.* at 931. It can be conceded that these definitions, taken in the abstract, are semantically plausible. In practice, however, and particularly for Speech or Debate purposes, the majority's definitions are too restrictive. Congress *necessarily* acts in a number of capacities: lawgiver, proprietor,[14] overseer, and investigator, to name a few. These varying functions are related: oversight and investigation, for instance, often lead to law-making. Because the Constitution contemplates that the national *legislature* will engage in each of these activities, and because the Congress does so, these activities are *legislative*. The House of Representatives' exercise of its constitutional authority over its own internal matters, including restaurant services, is no less legislative in nature. Indeed, in my opinion a strong general rule exists that decisions relating to any subject that one House entrusts in its rules on a regular basis to a committee should be considered legislative.[15] This rule is essential to the necessary day-to-day workings of Congress and is directly related to its efficient operation. It must be recognized that Congress knows its own business better than this Court does. The House knows what is necessary for it to function officially and efficiently as a legislative body. Congress serves as an open host to our nation. Every citizen has a constitutional right to appear and petition Congress, and out of practical necessity Congress has found it necessary to provide services for such citizens, its own staff, and itself.[16] Like an army, Congress and its employees must eat, and that function is best accomplished nearby.

In contrast to the overly restrictive view of the majority, the position outlined above is fully consistent with controlling Supreme Court decisions. Probably the best general definition of Speech or Debate remains that of *Kilbourn v. Thompson*, 103 U.S. 168, 26 L.Ed. 377 (1881): immunity attaches to all "things generally done in a session of the House by one of its members in relation to the business before it." *Id.* 103 U.S. at 204–05. More recently the Court has explained that in order to be protected, conduct

> must be an integral part of the *deliberative and communicative processes* by which Members participate *in committee* and House *proceedings* with respect to the consideration and passage or rejection of proposed legislation *or with respect to other matters which the Constitution places within the jurisdiction of either House.*

*Gravel, supra,* 408 U.S. at 625, 92 S.Ct. at 2627 (emphasis added). It is the last clause that has significance for this case. The majority's feeble effort to limit the *Gravel* Court's pronouncement by splicing the words "of state" into the clause immediately following the reference to "other matters," Majority Opinion at 926, does not succeed. Just as the Constitution vests the Congress with jurisdiction over interstate commerce and impeachments, it vests the House with jurisdiction over its own internal affairs. Confirmation of this broad reading of the Court's reference to "other matters" is found in *Brewster, supra,* in which the Supreme Court held that immunity attaches to how a Member speaks, debates, or votes, and indeed to *"anything* he [does] in the chamber or in committee ...." 408 U.S. at 526, 92 S.Ct. at 2544 (emphasis added).

14. *See* U.S.Const. art. IV, § 3; *United States v. Midwest Oil Co.,* 236 U.S. 459, 474, 35 S.Ct. 309, 313, 59 L.Ed. 673 (1915).

15. *See McSurely v. McClellan,* 553 F.2d 1277, 1296 (D.C.Cir.1976) (en banc); *United States v. Dowdy,* 479 F.2d 213, 226 (4th Cir.), *cert. denied,* 414 U.S. 823, 94 S.Ct. 124, 38 L.Ed.2d 56 (1973).

16. These services include, *inter alia,* the employment of Capitol police to furnish security, direct traffic and parking, and control access to buildings, and the services of elevator operators, guides, door tenders, custodial help, and restaurant managers and employees.

Applying the Supreme Court's tests to the case at bar, it is clear—no matter what else may be said—that oversight of the House Restaurant, including of *plaintiff's employment as the General Manager thereof, was "business before" the House Subcommittee on Services*. This Court is possessed of no standard by which to rule otherwise. The subject was under consideration pursuant to the rules of the House.[17] The question whether this business was law-making of national import simply does not arise. It is just as much the business of the House to oversee the operation of its Restaurant as it is to approve legislation of general applicability, or to establish adequate security personnel and oversee the operation of the Capitol police and other services that the House has found to be absolutely necessary to its operation.

The majority ignores, in grand fashion, the prerogative of the Congress to shape its own agenda. Indeed the categorical exclusion of oversight of necessary internal functions from the legislative sphere proves far too much. *Under the majority's theory, if the entire House had voted to dismiss the plaintiff—which it undeniably could have done, had it not chosen to delegate such matters—then each and every Member could be hauled into court to defend his or her vote.* If one were to follow the theory of the majority, the subject matter alone would render the decision non-legislative and non-immune. The result hypothesized would be plainly ridiculous, yet the decision in this case is not substantially different. This Court cannot simply decide by fiat that certain regular business of Congress, conducted under constitutional authority, is not truly "legislative" in the constitutional sense.[18] If any of defendants' alleged conduct in this case falls outside Speech or Debate immunity, it must be for some reason other than that House oversight of its Restaurant was merely internal or administrative, rather than legislative in nature.

B. *The Distinction Between Proceedings and Decisions in Committee and Subsequent "Execution" of the Decision to Discharge*

Because, under the Rules of the House, the Subcommittee on Services had jurisdiction over plaintiff's management of the House Restaurant, defendants are immune to the extent that their actions represent the direct outcome of votes or decisions made in committee. Thus the real question in this case is whether defendants—three of whom comprised the Subcommittee majority—can be held liable for any actions taken *outside* the Subcommittee. This Court must decide if plaintiff has sufficiently alleged such acts. In asserting their immunity, defendants have steadfastly maintained that their decision to fire appellant was "arrived at and effectuated

---

17. The entire structure of House oversight over its Restaurant makes the case for immunity here *stronger* than in *Davis v. Passman, supra,* a suit brought by an ex-deputy administrative aide against the Member who appointed her. In this case, the House as an institution exercises oversight over its own creature, the Restaurant. Thus personnel decisions relating to the Restaurant, when attended to by the Subcommittee, are made "business before" the House. By comparison, the House as an institution cannot be expected to exercise regular control over personnel attached to individual Members. Thus the majority wrongly presumes that this case is an easier case for holding against immunity than the situation presented in *Davis v. Passman. See* Majority Opinion at 930. It is not—just the converse is true.

18. The authority of the whole House to deal with this matter provides further reason for concluding that the subject of plaintiff's employment was not an issue lying outside the legislative sphere. Because the Subcommittee was exercising delegated authority, the House could presumably have overturned the Subcommittee decision and reinstated appellant. In addition, disciplinary steps could have been taken against the Members concerned, if discipline were warranted. *See* U.S.Const. art. I, § 5, cl. 2. Thus, at least two institutional remedies exist for the wrongful behavior of which plaintiff complains. The Supreme Court has suggested that the scope of Speech or Debate immunity is significantly determined by the effective scope of Congress' internal disciplinary process. *See Brewster, supra,* 408 U.S. at 518, 92 S.Ct. at 2540; L. Tribe, *American Constitutional Law* § 5–18 at 294 (1978).

'in committee' ...." Brief for Appellees at 10.

The majority treats the defendants' argument as entirely misguided, but in my view, several aspects of the majority's analysis are not supported by the record. First, as a factual matter, the majority opinion proclaims that plaintiff "does not center her case on any vote, resolution, hearing, report, or proceeding in the House or a committee or subcommittee thereof." Majority Opinion at 931. This is *not* an accurate and complete reading of the complaint. To the contrary, substantial allegations of the complaint assert the following:

> Defendants Mollohan and Coyne, together with Defendant Jones as Chairman, *constituted and now constitute a majority* of the Subcommittee on Services of the House Committee on Administration and as such were and are able to control the acts, practices and functions of the Subcommittee including the wrongful discharge of plaintiff.

> Defendants Mollohan and Coyne *relinquished their authority to participate in the hiring and firing practices of the Subcommittee, including specifically such authority as it related to plaintiff, and delegated such authority* to Defendants Jones and Marshall *with knowledge that Defendants Jones and Marshall intended to discharge Plaintiff.* Defendants subsequently refused to take action to revoke or nullify the wrongful discharge of plaintiff.

> The discharge of plaintiff and the refusal to revoke or nullify such discharge occurred *despite the objections of the other members of the Subcommittee not named as Defendants herein.*

Complaint ¶ 17 (JA 12–13) (emphasis added). In respect to at least this passage, the target of the complaint is the *decision of the majority* of the Subcommittee to discharge plaintiff, over the dissent of two Members not named as defendants. In essence, these very allegations pit the Subcommittee majority against the minority. Insofar as the decision to fire plaintiff is concerned, her complaint must be construed as alleging that it took place in committee.[19] The knowledgeable delega-

---

19. Defendants—the Subcommittee majority—have maintained that the "delegation" of which plaintiff complains occurred at a Subcommittee meeting on May 26, 1982, held in executive session. *See* Motion to Dismiss at 3–4 (JA 29–30). The complaint is entirely consistent with that account, and the opposition to the motion to dismiss did not contest the point. *See* Plaintiff's Opposition to Motion to Dismiss at 14–15 (JA 117–18). Upon the complaint and defendants' motion, the district court found that as a result of this meeting, "[s]ubsequent to May 26, 1982, the Subcommittee delegated full authority to hire and fire employees within the jurisdiction of the Subcommittee to Chairman Jones." *Walker v. Jones,* 557 F.Supp. 366, 367 (D.D.C. 1983). I perceive no flaw in that finding.

Relative to the alleged meeting of May 26, 1982, the majority, *see* Majority Opinion at 927 & n. 5, brushes aside defendants' reliance on a one-page document indicating the meeting of the Subcommittee in *executive session* on the date in question. (*See* JA 63). Given the broad sweep of plaintiff's allegations concerning the delegation of authority by the majority of the Subcommittee, at this point in this case little turns on the exact scope of the May 26, 1982, meeting. Further, in one sense what happened *within* the Subcommittee meeting is secondary. As this opinion has previously indicated, if plaintiff is to recover at all in this suit, it must be for conduct of defendants lying *outside* the Subcommittee's deliberations and decisions. Nonetheless, I feel constrained to comment upon the majority's out-of-hand rejection of the Subcommittee's showing, which may have some bearing on the case upon remand. In my view, that rejection fails to accord to the House the respect due to it from this Court.

One of the important provisions of Article I provides:

Each House shall keep a Journal of its Proceedings, and from time to time publish the same, *excepting such Parts as may in their Judgment require Secrecy;* and the Yeas and Nays of the Members of either House on any question shall, at the Desire of one fifth of those Present, be entered on the Journal.

U.S.Const. art. I, § 5, cl. 3 (emphasis added). The italicized clause quite obviously amounts to a textual commitment of an issue to a coordinate branch of government. Consistent with a general duty to keep the nation informed of its proceedings, each House has discretion to conduct business in secret, *i.e.,* in executive session, when circumstances and prudence in its judgment so require. In exercise of its constitutionally granted discretion, the House has provided that all meetings concerning "internal budget or *personnel matters*" are to be closed, or held in "executive session" as such meetings have traditionally been known. H.R. Rule XI, cl. 2(g)(1),

tion "to hire and fire" the plaintiff was tantamount to a specific decision by a majority of the committee to "fire" her. She had already been "hired" some years before. When the majority of the committee acted she was effectively "fired." Contrary to plaintiff's theory of this case,[20] allegations of bad faith or ill motive cannot strip Members' actions taken in committee of their legislative immunity. *See, e.g., Eastland v. United States Servicemen's Fund*, 421 U.S. 491, 508–09, 95 S.Ct. 1813, 1823–24, 44 L.Ed.2d 324 (1975); *United States v. Johnson, supra*, 383 U.S. at 180, 86 S.Ct. at 755.

In reversing the trial court's decision upholding the immunity of defendants Jones and Marshall, the majority also reasons that plaintiff "dominantly charges illegal conduct beyond the protection of the Speech or Debate Clause—the carrying out or execution of a constitutionally flawed decision." Majority Opinion at 931; *see id.* at 931–932. While I am not prepared to agree that the allegations of illegal execution are the "dominant" part of the complaint, one must agree with the majority's distinction between whatever happened in committee and subsequent acts executing the Subcommittee decision. Indeed in my opinion that distinction gives rise to the only substantial immunity issue in this case.

After *Gravel*, many of the Supreme Court decisions concerning Speech or Debate immunity must be understood in terms of the distinction between a legislative decision and the subsequent execution thereof. *See Gravel, supra*, 408 U.S. at

618–21, 92 S.Ct. at 2623–25 (explaining prior decisions). Ministerial steps taken subsequent to a legislative action are not immune merely because they relate to the underlying decision. In addition, *Gravel* makes it equally clear that for purposes of the decision-execution distinction, the actions of legislators and their high personal aides are treated identically. *Id.* at 618, 621, 92 S.Ct. at 2623, 2625. My quarrel here with the majority is not over its abstract reading of this doctrinal distinction, but with its substantial misapplications of the distinction to this case.

Let us first take defendants Representatives Mollohan and Coyne. Plaintiff alleges only that these two: 1) delegated their authority, as part of a working majority of the Subcommittee, to Representative Jones to decide whether to dismiss plaintiff, *with knowledge* of the Chairman's intent to discharge the plaintiff; and 2) failed to take steps to reinstate plaintiff once she was fired. Both charges relate to their official conduct as Congressmen. The first allegation concerns deliberative conduct *before* the dismissal, or perhaps a straightforward majority decision to discharge. These are exactly the types of official activities protected within Speech or Debate. The second allegation concerns only non-action of a sort that could not give rise to a cognizable legal claim. To the extent that the allegations can be viewed as an assertion that Representatives Mollohan and Coyne ratified the decision of Representative Jones, such ratification must be considered to be a deliberative function. By no means can

House Rules, *supra*, § 708 at 413–14 (emphasis added); *see also* H.R. Rule XI, cl. 1(a)(1), (2), House Rules, *supra*, § 703a at 405 ("The Rules of the House are the rules of its committees and subcommittees so far as applicable."). Thus contrary to the veiled suggestions of the majority, there is nothing irregular in the slightest about conducting business of the Subcommittee in executive session, or concerning the brief public record thereof. This was not a "smokescreen," as plaintiff would have this Court believe. *See* Brief for Appellant at 17. The majority suggests that the Subcommittee, like any other organization, must offer ordinary proof of the events that transpired that day if a court is to accept its version of those events. That ap-

proach fails to acknowledge the Article I, section 5 prerogative of the House, and is discordant with the underlying scheme of separation of powers. At best, the majority would put the Subcommittee majority (the defendants in this case) to a Hobson's choice between abandoning one or the other of two constitutional privileges—their power to conduct certain business in executive session, and their Speech or Debate immunity.

**20.** *See* Plaintiff's Opposition to the Motion to Dismiss at 14–16 (JA 117–19); Brief for Appellant at 17.

either step be viewed as "executing" an unlawful decision. Without question, in my opinion it is proper to dismiss Representatives Mollohan and Coyne from this case. They should not be harassed for official conduct within the legislative duties assigned to them and which they were elected to pursue. They never acted outside the Subcommittee.

The case concerning staff director Marshall is virtually the same. The complaint alleges that Marshall took a role in the events leading to the decision to discharge her, and also claims that Marshall acted with Representative Jones in firing the plaintiff. Complaint ¶ 15–16 (JA 12). Yet the only *act alleged* that resembles a discharge is the letter from Subcommittee Chairman Jones. *Id.* (*see* JA 64). There is no allegation that Marshall wrote that letter, or caused Representative Jones to do so. All that plaintiff specifically alleges on the part of Marshall is the circulation of a vacancy notice several days *after* the letter was written. Such a vacancy notice, if proved, could not possibly be considered either a decision to discharge, or an act executing such a decision. Moreover, in the context of the Rule 12(b)(1) motion to dismiss and upon the record before the district court, plaintiff's initial, general allegation of Marshall's complicity was no longer controlling when the district court decided the motion. Defendants directly denied that any non-Member had taken a hand in the effectuation of the discharge. *See* Defendants' Motion to Dismiss at 19 (JA 45). In response, plaintiff's recital of facts not only failed to provide any specifics, but furthermore, did not even repeat the general allegation in the complaint that Marshall had acted in concert with Representative Jones. *See* Plaintiff's Opposition to the Motion to Dismiss at 3 (JA 106). Thus plaintiff failed to carry her burden to show that any of Marshall's involvement in the case lay outside the scope of Speech or Debate. Contrary to plaintiff's contention in the district court, Marshall cannot be made liable merely on the theory that he was the "alter ego" of Representative Jones. Plaintiff's Opposition to Motion to Dismiss at 15 (JA 118). Defendant Marshall cannot be held legally responsible for mere association with Representative Jones' role in plaintiff's discharge, for the Speech or Debate Clause immunizes deliberation and communication between legislators and their aides. Upon the record before it, the district court did not err in dismissing defendant Marshall from this suit.

Thus we are left only with Representative Jones, the alleged protagonist. The majority observes that the plaintiff "complains of Jones's execution ... of what appellees term a legislative order." Majority Opinion at 932. The only alleged act of an even remotely "executing" character is Representative Jones' writing of a letter dated June 22, 1982, notifying plaintiff of her termination. (*See* JA 64). As to the legal effect of this letter upon Representative Jones' immunity, this case ought to be remanded to the district court for development of the facts. To that narrow extent, I agree with the majority's remand of this case. The writing of the letter has not been denied. Upon the murky and incomplete record in this case at its present stage, however, the legal effect of Representative Jones' letter is a speculative matter. Neither the trial court nor this Court knows enough about how that letter fits into the chain of events preceding appellant's discharge to decide whether the Chairman's writing of the letter was, in itself, an "execution" of the Subcommittee's decision to dismiss Walker. To the extent the majority implies, upon the record before this Court, that the district court would be bound to regard the letter as an "executing" act within the sense of Speech or Debate doctrine, I must dissent. That question should be left open for the district court to decide in the first instance, after fuller development of the relevant facts.

Several factors weigh against this Court's apparent conclusion that Representative Jones' letter could constitute an "executing" act *outside* the scope of his Speech or Debate immunity. Although the

Supreme Court has indicated that legislators and legislative aides are treated identically for immunity purposes, the Court has never *actually* held a legislator's acts nonimmune because of their "executing" nature.[21] The reason for this is obvious: the distinction between legislative and executing acts is almost always paralleled by the division of labor between legislators and legislative aides. Members of Congress and Congressional committees quite sensibly assign ministerial tasks to aides. In general, a court should presume that Congress has organized its functional structure along such lines, and thus that acts regularly performed by Members are "legislative" in nature. This position finds support in the Supreme Court's holding in *Kilbourn, supra,* immunizing all acts "generally done" by Members in relation to pending business. As *Gravel* indicates, there may be irregular or aberrational instances—for instance, when a Member *personally* carries out an illegal arrest, or conducts an unlawful search. *See* 408 U.S. at 621, 92 S.Ct. at 2625. In my opinion, however, a court should hesitate before reaching the unusual conclusion that a Member has taken upon himself the ministerial role of executing a legislative decision. One relevant factual consideration in this case, then, is whether Representative Jones' sending a letter to the plaintiff—the senior manager of the Restaurant who reported directly to the Subcommittee—notifying her of her dismissal (which was based upon the action of the Subcommittee) was irregular in any sense, or whether subcommittee chairmen normally notify such higher legislative employees of such personnel decisions.

Particularly if the letter was not irregular, then the majority cuts the decision-execution distinction far too thinly. Congress does not operate in a vacuum; its decisions must be communicated through some institutional channels in order to have any effect. That form of communication alone cannot be viewed as outside the legislative sphere, or else Speech or Debate immunity would evaporate entirely. The Supreme Court has recognized as much. In *Eastland v. United States Servicemen's Fund, supra,* Senator Eastland was held *immune* from suit for having signed a subpoena that allegedly infringed respondents' rights in a substantial way. *See* 421 U.S. at 494, 503–07, 95 S.Ct. at 1816, 1821–23.[22] The Supreme Court has not distinguished as finely as does this Court today between a legislative decision and the communication thereof.[23] Thus in my mind, it remains an open question—for decision upon a fuller factual record—whether Representative Jones' letter was protected as the internal communication of a legislative decision, or whether it was an act "executing" that decision.

Another important and related question is whether other officials—persons not named as defendants in this suit—were involved in "executing" the decision to terminate the plaintiff. We know, for instance, that at one time the Architect of the Capitol was responsible for direct management of the House Restaurant. *See supra* note 13. In a case remarkably similar to that at bar, the Architect was held non-immune for having executed the dismissal of a plaintiff, while defendant legislators were held immune. *See Parker v. Allen,* Civ. A. No. 74–1846, slip op. (D.D.C. June 6, 1975) (suit by Senate Restaurant head waiter). Furthermore, a copy of Representative Jones' letter, signed as "Chair-

---

**21.** The majority recognizes this point. *See* Majority Opinion at 932 n. 11.

**22.** Similarly, in *Powell v. McCormack, supra,* the Court held legislators immune from liability on the basis of resolutions, recorded in the Congressional Record, that had the effect of excluding Representative Powell from the House. *See* 395 U.S. at 490, 492–93, 506, 89 S.Ct. at 1947, 1948–49, 1956.

**23.** The majority's apparent willingness to entertain the possibility that the mere writing of a

letter to a dismissed employee is an act "executing" the decision to dismiss, and thus breaches immunity that would otherwise attach to the underlying decision, seems overly facile. If such were the case, then it is difficult to see why the *Davis v. Passman* Court avoided the question of Speech or Debate immunity. *See* 442 U.S. at 235–36 n. 11, 99 S.Ct. at 2271–72 n. 11. That case also involved a discharge letter. *See id.* at 230–31 n. 3, 99 S.Ct. at 2269–70 n. 3.

man," was directed to the "Administrative Officer," (JA 64) possibly indicating the need for further ministerial steps in the discharge of appellant. If such an official had direct responsibility for terminating plaintiff in this case, then Representative Jones' letter must be viewed in a way quite different from that which the majority indicates. If plaintiff could have sued such an official, then resolution of the conflict between allowing for judicial review of an allegedly unlawful act and protecting legislators from harassment would have been made considerably easier. Applying this analysis, the Supreme Court has indicated that as a pragmatic matter, the availability of redress against legislative aides rather than Members can provide reason for excusing legislators from suit. *See Powell v. McCormack, supra,* 395 U.S. at 505–06 & n. 26, 89 S.Ct. at 1955–56 & n. 26. That being the case, the *potential* availability of such defendants becomes important. Plaintiff's failure to name such officials could be fatal to her case: a legislator who would otherwise be immune should not be kept in a case merely because the plaintiff has failed to pursue appropriate avenues of redress.

For the foregoing reasons, any immunity ruling as to Representative Jones' acts after the decision to dismiss was reached should be made by a court on a complete record of the events. In my view this case should be remanded to the district court for such an inquiry,[24] and the decision of the district court should be affirmed in all other respects.[25] To the extent that the majority opinion differs from the foregoing discussion, I respectfully dissent.

---

24. In addition, the district court must determine whether the allegedly false (and apparently defamatory) statements by Representative Jones—the circumstances of which remain a mystery—were made at all or were made under immune circumstances. *See Hutchinson v. Proxmire,* 443 U.S. 111, 123–33, 99 S.Ct. 2675, 2682–87, 61 L.Ed.2d 411 (1979).

25. It should also be noted that under the logic of *Helstoski v. Meanor,* 442 U.S. 500, 506–08, 99 S.Ct. 2445, 2448–49, 61 L.Ed.2d 30 (1979), this Court's decision denying the two defendants' immunity is immediately reviewable in the Supreme Court; defendants need not await trial and judgment in order to seek review.